Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA            )
                                    )
        v.                          )       No. 07 CR 864
                                    )       Hon. Sidney I. Schenkier
MOHAMMED A. SODAGAR                 )

## ORDER OF DETENTION PENDING TRIAL

THIS CAUSE coming on to be heard upon the Government's motion to detain defendant Mohammed A. Sodagar, pursuant to 18 U.S.C. § 3142, and this Court having reviewed and considered the evidence presented, as well as having heard argument on this matter on January 3, 2008, the Court hereby finds as follows:

1.      The defendant is charged in a two-count complaint alleging: (1) fraud and related activity in connection with identification documents and information, in violation of 18 U.S.C. § 1028(a)(3); and (2) fraud in connection with access devices, in violation of 18 U.S.C. § 1029(a)(3).

2.      The defendant has agreed to waive the right to a preliminary hearing within ten days of his initial appearance. Fed.R.Crim.P. 5.1(c) . The parties have jointly requested and agreed upon a status hearing before the Court on February 5, 2008 at 9:30 a.m. to advise the Court whether the defendant will request a probable cause at that time. At this juncture, the complaint thus serves as probable cause to hold the defendant pending further proceedings.

3.      The Court finds that the statutory factors enumerated in 18 U.S.C. § 3142(g) favor detention of the defendant. The Court finds as follows:

        A.      The nature and circumstances of the offenses charged in the complaint, and elaborated upon by the United States at the detention hearing, favor detention. The complaint alleges that the defendant assembled an array of false identity documents for the purpose of committing fraud. The gravamen of the charges, *i.e.*, the possession of fictitious identity documents and credit card devices with the intent to defraud, are items that could easily be used to flee the jurisdiction. Furthermore, the defendant is facing a statutory maximum term of ten years imprisonment. While

some offenses carry a lengthier statutory maximum sentence, a 10-year term of imprisonment is not insubstantial.

        B.      The weight of the evidence is a factor favoring detention, but only a slight factor. The Court notes that the defendant reportedly stated to the Illinois Secretary of State Police in 2003 that he possessed fictitious identity documents so that he could assume a false identity if he had legal troubles. Nonetheless, the defendant enjoys a presumption of innocence. As such, this factor weighs only slightly in favor of detention.

        C.      With respect to the background, history, and characteristics of the defendant, the Court takes judicial notice of the report prepared by the Office of Pretrial Services ("Pretrial"). The Pretrial report indicates that, to the defendant's credit, he has no prior felony convictions and no history of drug use. He is a longtime resident of the Chicago area, and he has gone through the appropriate channels to become a naturalized citizen of the United States. On the other hand, the evidence before the Court suggests that the defendant's relationship with his immediate family is strained, as his wife and children have obtained an order of protection against him. In addition, the defendant does not currently hold any income-generating employment. Furthermore, the Court is troubled that the defendant's relatives were unable to corroborate the defendant's self-reported employment history. The Court also notes that the defendant has a prior misdemeanor conviction for possession of fictitious driver's licenses.

    While the defendant's brothers are willing to sign a signature bond, they are lack the ability to post a property or substantial cash bond. Furthermore, the defendant is unable to post his own residence as collateral, as the residence is co-owned by a relative who has obtained an order of protection against him and has expressed no interest in being a surety. The Court believes that it is important that a bond involve some real—rather than theoretical—risk of loss to any surety, thus creating an incentive for the defendant to return for future judicial proceedings and not flee the jurisdiction. At this juncture, the Court sees no evidence that any putative surety is able to post such a bond.

4.     Based on the aforementioned factors, in light of the Pretrial report and other evidence proffered by the Government, the Court finds that the United States has met its burden of showing by a preponderance of the evidence that the defendant is a serious risk of flight and that no condition or set of conditions will reasonably assure the appearance of the defendant at future proceedings, as required.

IT IS HEREBY ORDERED, pursuant to 18 U.S.C. § 3142(e), that defendant Mohammed A. Sodagar remain in custody for future proceedings.  This finding is without prejudice to renew a motion for bond based on changed circumstances.

IT IS FURTHER ORDERED that defendant shall be afforded reasonable opportunity for private consultation with his counsel.

IT IS FURTHER ORDERED that the parties appear before the Court on February 5, 2008 at 9:30 a.m. for a status hearing with respect to whether there will be a preliminary hearing or whether the defendant will waive such a hearing and agree to a finding of probable cause to hold him to answer charges against him.

ENTER:


_____
SIDNEY I. SCHENKIER
United States Magistrate Judge


Dated: January _____, 2008.

3

Exhibit B



**PROPERTY**
**VALUATION**
**SERVICES**

*telephone:* 773.777.4600   *facsimile:* 773.777.5977
www.pvsllc.com

October 3, 2007

Mr. Akbar Lalani
Premier Bank
1210 Central Avenue
Wilmette, Illinois 60691

RE:  2405 W. Augusta Boulevard
Chicago, Illinois

Dear Mr. Lalani:

Pursuant to your request, we have completed a Summary Appraisal Report of the property located at the above referenced address.

The subject is briefly described as a 7,829± square foot, rectangular, and corner site utilized as a self-serve, gas-station with 72.43± feet of frontage along Western Avenue and 108.10± feet along Augusta Boulevard, zoned B3-2, Community Shopping District in Chicago, Illinois.

The property is improved with a 28± year old, masonry constructed, kiosk building containing a gross building area of only 122± square feet. The building is utilized for gasoline and merchandise sales, which are transacted through a window with customers standing on the outside of the building, and contains a washroom. Merchandise sales are limited to cigarettes, candy, snacks, drinks, and auto related merchandise. The property also contains (2) dual-sided and (1) three-product, fuel dispensers lying beneath a 1,700± square foot canopy.

**As will be noted in our highest and best use analysis, the subject improvement no longer has any contributory value to the land and should be demolished, however, due to a deed restriction placed upon the land by the current owner, the property is only allowed to be utilized for the sole use, as a B. P. gas-station, for the next twenty years.**

Market Value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.    Buyer and seller are typically motivated.

2.    Both parties are well informed or well advised, and acting in what they consider their own best interests;

3.    A reasonable time is allowed for exposure in the open market;

4.    Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(Continued on next page)

4801 W. PETERSON, SUITE 606, CHICAGO, IL 60646

Page Two

5.    The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source:    The Appraisal of Real Estate, 12th Edition, page 23, Published 2001 by the Appraisal Institute/The Federal Register, Vol. 53, No. 163, August 22, 1990, pages 34228 and 34229.

The subject property has been inspected and we have made a thorough investigation and analysis in order to arrive at a sound opinion of its fee simple market value for purposes as described herein. The accompanying report describes in detail the method of appraisal and contains data gathered in our investigation.

The depth of discussion contained in this report is specific to the needs of our client and is only for their sole intended use, to assist them in making a lending decision regarding the subject property.

This summary appraisal report has been prepared in conformance with the Uniform Standards of Professional Appraisal Practice and is intended for federally related financing purposes. It is in conformance with the requirements of Title XI of FIRREA, which would be the requirement for use for federally related financing.

In our opinion, the Value in Use as a Going Concern of the subject property, as described herein, expressly subject to the Assumptions and Limiting Conditions contained in this report, as of September 10, 2007 was:

### NINE HUNDRED TWENTY EIGHT THOUSAND TWO HUNDRED DOLLARS
#### ($928,200)

### SUBJECT TO NO ENVIRONMENTAL CONTAMINATION

Respectfully submitted,

Bradley Glatter,
Certified General Real Estate Appraiser,
#553.001684, Expiration Date 09/09

REVIEWED AND APPROVED:

Mitchell J. Perlow, MAI
Certified General Real Estate Appraiser,
#553.000338, Expiration Date 09/09

## SUMMARY OF SALIENT FACTS

LOCATION:

2405 W. Augusta Boulevard
(SWC Western Avenue & Augusta Boulevard)
Chicago, Illinois

PROPERTY INDEX NUMBER:

16-01-420-044

IMPROVEMENT*:

The property is improved with a 28± year old, masonry constructed, kiosk building containing a gross building area of 122± square feet. The building is utilized for gasoline and merchandise sales, which are transacted through a window with customers standing on the outside of the building, and contains a washroom. Merchandise sales are limited to cigarettes, candy, snacks, drinks, and auto related merchandise. The property also contains (2) dual-sided and (1) three-product, fuel dispensers lying beneath a 1,700± square foot canopy.

*Due to a deed restriction, the property is only allowed to be utilized as a B. P. gas-station for the next twenty years.

SITE SIZE:

7,829± square feet

SHAPE:

Rectangular

ZONING:

B3-2, Community Shopping District

HIGHEST AND BEST USE (AS VACANT):    Commercial development

HIGHEST AND BEST USE (AS IMPROVED):    Present use

VALUE INDICATORS:

| | |
|---|---|
| Cost Approach: | Not Applicable |
| Income Capitalization Approach: | Not Applicable |
| Sales Comparison Approach (Land Value As Vacant and Unencumbered): | $1,020,000 |

FINAL OPINION OF VALUE IN USE AS
A GOING CONCERN (CONTRACT PRICE):    $928,200

DATE OF INSPECTION:

September 10, 2007

DATE OF VALUATION:

September 10, 2007

1

34999

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to develop an opinion of the Market Value (as defined herein) of the subject property described in this report.

## INTENDED USE/USER

Our opinion of value is only to be utilized solely by our client, Premier Bank, to assist them in making a lending decision regarding the subject property. There are no other authorized uses or users of this report. Acceptance of, and/or use of this appraisal report constitutes acceptance of the Assumptions and Limiting Conditions contained in the Addenda section of this report.

## DEFINITION OF MARKET VALUE

Market Value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.    Buyer and seller are typically motivated.

2.    Both parties are well informed or well advised, and acting in what they consider their own best interests;

3.    A reasonable time is allowed for exposure in the open market;

4.    Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.    The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source:    The Appraisal of Real Estate, 12th Edition, page 23, Published 2001 by the Appraisal Institute/The Federal Register, Vol. 53, No. 163, August 22, 1990, pages 34228 and 34229.

34999

## PERSONAL PROPERTY

Any personal property involved in the transaction has been excluded from the valuation of the real property. Should a transaction appear to include personal property of sufficient value so as to affect the market value of the real property, a separate assessment of the real property would be included with the report as a separate valuation. The subject property has a value in use as a going concern which includes personal property along with the real property in the value. A separate allocation for personal property was not reported to us or was found in the purchase and sale agreement.

## LEGAL DESCRIPTION

The following legal description was found on (Exhibit A) of the Purchase and Sale Agreement for the subject as well as the attached Plat of Survey:

*LOTS 20, 21 AND 22 (EXCEPT THAT PART OF SAID LOTS LYING EAST OF A LINE 50 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SECTION 1 IN BLOCK 1 IN THE SUBDIVISION OF THE NORTH 3/4 OF THE EAST 1/2 OF THE SOUTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 1, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.*

## HISTORY OF THE PROPERTY

According to county records, the subject improvement was constructed in 1979. The subject is a B.P. gas-station property with a 122± square foot building handling fuel sales in addition to other major profit center retail sale categories such as cigarettes, food, drinks, and other auto-related general merchandise. The subject is currently under contract with the current tenant purchasing the property (under the deed restriction that the property remain a B.P. gas-station for the next twenty years) for $928,200 (See Addenda for Exhibit B, page C1-7, Petroleum and Convenience Store Restrictions). The entire purchase and sale agreement inclusive of attached exhibits is quite lengthy and has been retained in our files and available upon request. There have been no reported sales of the subject over the past five years.

9

34999

## MARKETING PERIOD AND EXPOSURE TIME

The Definition of Market Value requires that a reasonable time be allowed for exposure in the open market. This exposure time is presumed to have occurred prior to the date of the appraisal, while the estimated marketing period occurs after the date of appraisal.

Exposure time and marketing period could be the same, given a stable market environment with no change anticipated in market conditions. However, in many instances this is not the case. If the market is improving, the marketing period would most likely be less than the exposure period. If the market conditions were anticipated to worsen, however, the opposite may be true.

Over the past six months, sales of vacant land in the "West Town" area had an average marketing period of three months from a sample of fifteen closed sales reported on the Multiple Listing Service of Northern Illinois. Without the lowest and the highest marketing times, the land sales had a range of marketing times from four days to nine months.

Land Sales 1 and 5 reported a three month and a half-month marketing period. None of the other land sale comparables utilized herein reported a marketing period.

As such, we estimate a marketing period for the subject site "as vacant" of three to nine months, assuming professional brokerage.

34999

## SITE DESCRIPTION

LOCATION:                    The subject is located at the southwest corner of Western

                             Avenue and Augusta Boulevard, in the City of Chicago.


TOPOGRAPHY:                  Generally level and at grade with the surrounding

                             improvements and having a slight pitch for water drainage.


ORIENTATION:                 Faces east


SHAPE:                       Rectangular


FRONTAGE:*                   72.43± feet on the west side of Western Avenue (east lot

                             line).


DEPTH:*                      108.10± feet on the north and south lot lines.


REARAGE:*                    72.42± feet on the west lot line.


AREA:*                       7,829± square feet


LAND-TO-BUILDING RATIO:      64.17 to 1


* A Plat of Survey was provided to us. The above site dimensions and area were derived from the attached
  Plat of Survey and this report is subject to its accuracy.

34999

27

## SITE DESCRIPTION - Continued

**STREETS:** Western Avenue is a two-way, north/south, four-traffic-lane with a turning lane, asphalt-paved street in average condition. Augusta Boulevard is a two-way, east/west, two-traffic-lane, asphalt-paved street in average condition. The streets have concrete curbs, gutters and sidewalks, storm and sanitary sewers, city street lights and have parallel parking on both sides of the streets. This is a signaled intersection.

**ACCESS:** There are two curb cuts into the site on each street.

**UTILITIES:** All utilities including electric, gas, water, storm and sanitary sewers and telephone service the site.

**ALLEY:** Sixteen foot wide concrete alley at the rear of the site in average condition.

**OTHER SITE IMPROVEMENTS:** Besides the main structure, the site is primarily concrete areas in average condition, a 1,700± square foot canopy over the concrete islands containing the fuel-pumps, concrete curbing, two pay telephones, concrete base for vacuum and air-compressor, pole lighting, wood fencing and signage.

## IMPROVED SALE COMPARABLE NUMBER 1



| | |
|---|---|
| **LOCATION:** | 6801 N. Western Avenue |
| | (Northeast Corner Western and Pratt Avenues) |
| | Chicago, Illinois |
| **PROPERTY INDEX NUMBER:** | 11-31-121-007 |
| **SITE SIZE:** | 22,913± square feet (rectangular site) |
| **ZONING:** | B3-2 |
| **BUILDING AREA:** | 1,550± square feet |
| **LAND-TO-BUILDING RATIO:** | 14.78 to 1 |

50

IMPROVED SALE COMPARABLE NUMBER 1 - Continued

YEAR BUILT:                          1973 with 2002 renovation

NUMBER OF BUILDINGS:                 One

NUMBER OF STORIES:                   One

PROPERTY DESCRIPTION:                Self-service, gas-station with mini-mart building and (3)
                                     dual-sided fuel dispensers under a canopy.

CONSTRUCTION:                        Metal panel

SALE DATE:                           May 23, 2007

DOCUMENT NUMBER:                     0715244012

SALE PRICE:                          $1,821,000.00

SALE PRICE PER SQUARE FOOT OF
BUILDING, FOR LAND AND BUILDING:     $1,174.84

SALE PRICE PER SQUARE FOOT OF
LAND, FOR LAND AND BUILDING:         $79.48

COMMENTS:                            This larger corner site, gas-station property contains a much
                                     larger building and is located on the same street as the
                                     subject, in a similar general area. Compared to the subject,
                                     it has an inferior land-to-building ratio. Prior to this sale,
                                     the property previously sold in January, 2002 for $1,300,000
                                     or $838.71 per square foot of building area. This was and
                                     still is a 7-11 store and Citgo gas-station.

34999

PAGE  22/66            PREMIER BANK            8479200327    13:41  01/14/2008

IMPROVED SALE COMPARABLE NUMBER 2



LOCATION:                                2670 N. Lincoln Avenue

                                         (South of Intersection of Lincoln and Seminary Avenues)

                                         Chicago, Illinois

PROPERTY INDEX NUMBERS:                  14-29-410-001

                                         14-29-410-002

SITE SIZE:                               7,370± square feet (irregular shape site)

ZONING:                                  B3-2

BUILDING AREA:                           144± square feet

LAND-TO-BUILDING RATIO:                  51.18 to 1

52

IMPROVED SALE COMPARABLE NUMBER 2 - Continued

YEAR BUILT:                        1984

NUMBER OF BUILDINGS:               One

NUMBER OF STORIES:                 One

PROPERTY DESCRIPTION:              Self-service, gas-station with kiosk building, and (4) dual-
                                   sided fuel dispensers under a canopy and a separate building
                                   with two washrooms and a storage room.

CONSTRUCTION:                      Masonry/brick and metal panel.

SALE DATE:                         August 15, 2005

DOCUMENT NUMBER:                   0525635200

SALE PRICE:                        $1,200,000.00

SALE PRICE PER SQUARE FOOT OF
BUILDING, FOR LAND AND BUILDING:   $8,333.33

SALE PRICE PER SQUARE FOOT OF
LAND, FOR LAND AND BUILDING:       $142.46

COMMENTS:                          This similar size corner site, gas-station property contains a
                                   similar size and type of building.  It is located on a superior
                                   street and is in a superior general area, as compared to the
                                   subject.  It has a similar land-to-building ratio.  Prior to this
                                   sale, the property previously sold in July, 2004 for
                                   $1,050,000 or $7,291.67 per square foot of building area.
                                   This was and still is a Mobil gas-station.

## IMPROVED SALE COMPARABLE NUMBER 3



LOCATION:

4000 W. Touhy Avenue

Northwest Corner Touhy and Crawford Avenues

Lincolnwood, Illinois

PROPERTY INDEX NUMBER:

10-27-431-052

SITE SIZE:

14,375± square feet (rectangular)

ZONING:

B-2

BUILDING AREA:

880± square feet

LAND-TO-BUILDING RATIO:

16.34 to 1

54

34999

IMPROVED SALE COMPARABLE NUMBER 3 - Continued

YEAR BUILT:                          1994

NUMBER OF BUILDINGS:                 One

NUMBER OF STORIES:                   One

PROPERTY DESCRIPTION:                Self-serve, gas-station with mini-mart building and an
                                     attached drive-through, touchless car-wash and (5) dual-
                                     sided, fuel dispensers under two canopies.

CONSTRUCTION:                        Masonry/concrete block

SALE DATE:                           August 23, 2005

DOCUMENT NUMBER:                     0525635577

SALE PRICE:                          $1,879,000.00

SALE PRICE PER SQUARE FOOT OF
BUILDING, FOR LAND AND BUILDING:     $2,135.23

SALE PRICE PER SQUARE FOOT OF
LAND, FOR LAND AND BUILDING:         $130.71

COMMENTS:                            This larger corner site, gas-station property contains a larger
                                     mini-mart/car wash building.  It is located on a superior
                                     street and is in a superior general area, as compared to the
                                     subject. It has an inferior land-to-building ratio. At the time
                                     of sale, this was Union 76 gas-station and is now a
                                     Marathon branded gas-station.

Exhibit C



**First American Title Insurance Company**
**National Commercial Services**
30 North LaSalle Street, Suite 310 • Chicago, IL 60602

**Final Settlement Statement**

| Property: | 2405 West Augusta, Chicago, IL | File No: | NCS-233354-CHI1 |
|---|---|---|---|
| | | Officer: | Dina Frazier-Williams/dmw |
| | | New Loan No: | 47729001 |
| | | Settlement Date: | 10/17/2007 |
| | | Disbursement Date: | 10/23/07 |
| | | Print Date: | 10/17/2007, 1:03 PM |

| Buyer: | Sodagar Business, Inc. |
|---|---|
| Address: | 2405 West Augusta, Chicago, IL |
| Seller: | BP Products North America Inc. |
| Address: | |

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | **Consideration:** | | |
| 928,200.00 | | Total Consideration | | 928,200.00 |
| | | | | |
| | | **Deposits in Escrow:** | | |
| | | Receipt No. 88820480 on 10/17/2007 by First American Title Company | | 629.13 |
| | 92,820.00 | Receipt No. 88820479 on 10/17/2007 by transfer from 301016-023 | | |
| | | | | |
| | | **Adjustments:** | | |
| | 5,997.15 | 2007 Real Estate Tax Proration | 5,997.15 | |
| | 1,372.00 | Dealer Lease Rent | 1,372.00 | |
| | | | | |
| | | **New Loan(s):** | | |
| | | Lender: Premier Bank | | |
| | 742,500.00 | New Loan Amount  - Premier Bank | | |
| 5,000.00 | 3,712.50 | Prepaid  - Premier Bank | | |
| 1,287.50 | | Prepaid Finance Balance Owed  - Premier Bank | | |
| 750.00 | | Cancellation Fee  - Premier Bank | | |
| 25.00 | | Flood Search  - Premier Bank | | |
| 250.00 | | Documentation Fee  - Premier Bank | | |
| 25.00 | | Courier Fee  - Premier Bank | | |
| 2,000.00 | | Appraisal Fee  - Premier Bank | | |
| 99.00 | | Tax Service Fee  - Premier Bank | | |
| 5,333.36 | | Tax Escrow Reserve  - Premier Bank | | |
| 150.00 | | UCC Search and Filing Fees  - Premier Bank | | |
| | | | | |
| | | **Title/Escrow Charges to:** | | |
| 250.00 | | Closing-Escrow Fee - First American Title Insurance Company National Commercial Services | 250.00 | |
| 25.00 | | Overnight Delivery Service - First American Title Insurance Company National Commercial Services | 50.00 | |
| 1,700.00 | | Policy-Standard ALTA 2006 Owner's - First American Title Insurance Company National Commercial Services | | |
| 290.00 | | Policy-Standard ALTA 2006 Lender's - First American Title Insurance Company National Commercial Services | | |
| | | Wire Transfer Service - First American Title Insurance Company National Commercial Services | 50.00 | |
| 6,964.00 | | Documentary Transfer Tax-City - First American Title Insurance Company National Commercial Services | | |
| 350.00 | | Recording Services - First American Title Insurance Company National Commercial Services | | |
| 464.25 | | Documentary Transfer Tax-County - First American Title Insurance Company National Commercial Services | | |
| 928.50 | | Documentary Transfer Tax-State - First American Title Insurance Company National Commercial Services | | |
| | | | | |
| | | **Disbursements Paid:** | | |
| 2,750.00 | | Legal Fees to Joel Hyman | | |
| 261.19 | | Cost to Joel Hyman | | |
| | | Per Direction to Chicago Deferred Exchange Company | 700,000.00 | |
| 600.00 | | Survey to Survey Services | | |
| | | | | |
| | | **Funds Held:** | | |
| | | Funds Held: 2X 1st Installment held for 2nd installment of 2006 RE taxes | 7,548.14 | |

Initials: _____          _____          Page 1 of 2

Continued From Page 1

## Final Settlement Statement

Settlement Date: 10/17/2007
Print Date: 10/17/2007

File No: NCS-233354-CHI1
Officer: Dina Frazier-Williams/dmw

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | 111,301.15 | Cash (X From) ( To) Borrower | | |
| | | Cash (X To) ( From) Seller | 213,561.84 | |
| | | | | |
| 957,702.80 | 957,702.80 | Totals | 928,829.13 | 928,829.13 |

BUYER(S):

Sodagar Business, Inc.

By: KADAR SODAGAR President

SELLER(S):

BP Products North America Inc.

By: Anthony S. Hui, Attorney

# Exhibit D

Form No. 1402.06
ALTA Owner's Policy (6-17-06)
1100302P050600



Policy Page 1
Policy Number: 233354

# OWNER'S POLICY OF TITLE INSURANCE

ISSUED BY

## First American Title Insurance Company

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at the address shown in Section 18 of the Conditions.

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
       (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
       (ii) failure of any person or Entity to have authorized a transfer or conveyance;
       (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
       (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
       (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
       (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
       (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental

police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.
9. Title being vested other than as stated in Schedule A or being defective
   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
       (i) to be timely, or
       (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.
10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this policy, but only to the extent provided in the Conditions.

*First American Title Insurance Company*

BY *Ciat S. Johnson*    PRESIDENT

ATTEST *[signature]*    SECRETARY

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risks 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

## CONDITIONS

### 1. DEFINITION OF TERMS

The following terms when used in this policy mean:
   (a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
   (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
   (c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
   (d) "Insured": The Insured named in Schedule A.
      (i) The term "Insured" also includes
         (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;
         (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
         (C) successors to an Insured by its conversion to another kind of Entity;
         (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
            (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
            (2) if the grantee wholly owns the named Insured,
            (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
            (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

      (ii) With regard to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.
   (e) "Insured Claimant": An Insured claiming loss or damage.
   (f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
   (g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
   (h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
   (i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
   (j) "Title": The estate or interest described in Schedule A.
   (k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

### 4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

### 5. DEFENSE AND PROSECUTION OF ACTIONS

   (a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.
   (b) The Company shall have the right, in addition to the options contained in

Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)  Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

## 6.  DUTY OF INSURED CLAIMANT TO COOPERATE

(a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

## 7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)  To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii)  To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs,

attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

## 8.  DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)  The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of
(i)  the Amount of Insurance; or
(ii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,
(i)  the Amount of Insurance shall be increased by 10%, and
(ii)  the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the time it is settled and paid.

(c)  In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

## 9.  LIMITATION OF LIABILITY

(a)  If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)  In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c)  The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## 10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

## 11.  LIABILITY NONCUMULATIVE

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

## 12.  PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 13.  RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a)  Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

Case 1:07-cr-00864     Document 11-2     Filed 01/17/2008     Page 27 of 29

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

## 14. ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

## 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 16. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 17. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefore in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 18. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at 1 First American Way, Santa Ana, CA 92707, Attn: Claims Department.

# POLICY OF TITLE INSURANCE



# SCHEDULE A

## *First American Title Insurance Company*

Name and Address of Title Insurance Company:
First American Title Insurance Company
30 North LaSalle Street, Suite 310
Chicago, IL 60602

File No.: **NCS-233354-CHI1**                    Policy No.: **233354**

Amount of Insurance:  $928,200.00
Date of Policy:  October 30, 2007

1.     Name of Insured:

       Sodagar Business, Inc., an Illinois corporation

2.     The estate or interest in the Land that is insured by this policy is:

       Fee Simple

3.     Title is vested in:

       Sodagar Business, Inc., an Illinois corporation

4.     The Land referred to in this policy is described as follows:

       Real property in the City of Chicago, County of Cook, State of Illinois, described as follows:

       LOTS 20, 21 AND 22 (EXCEPT THAT PART OF SAID LOTS LYING EAST OF A LINE 50 FEET WEST
       OF AND PARALLEL WITH THE EAST LINE OF SECTION 1 IN BLOCK 1 IN THE SUBDIVISION OF
       THE NORTH 3/4 OF THE EAST 1/2 OF THE SOUTHEAST 1/4 OF THE SOUTHEAST 1/4 OF
       SECTION 1, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN
       COOK COUNTY, ILLINOIS.

# SCHEDULE B

File No.: **NCS-233354-CHI1**                    Policy No.: **233354**

## EXCEPTIONS FROM COVERAGE

This Policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

1. General real estate taxes for the year 2007 are not yet ascertainable or payable.

   Permanent Index Number: 16-01-420-044-0000

2. Terms, provisions and conditions of Leaking Underground Storage Tank Environmental Notice recorded August 20, 2003 as document 0323231074.

3. Memorandum of Dealer Supply Agreement for Dealer-Owned, Dealer-Operated Facility dated October 17, 2007 recorded October 30, 2007 as document 0730322035 made by and between BP Products North America Inc. and Sodagar Business Inc.

4. Option Agreement dated October 17, 2007 recorded October 30, 2007 as document 0730322036 made by and between Sodagar Business Inc. and BP Products North America Inc.

5. Mortgage dated October 17, 2007 and recorded October 30, 2007 as document 0730322037, made by Sodagar Business Inc., to Premier Bank, to secure an indebtedness in the amount of $742,500.00, and the terms and conditions thereof.

6. Assignment of Rents made by Sodagar Business Inc. to Premier Bank recorded October 30, 2007 as document 0730322038.

End of Schedule B